# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **MEERA SALAMAH,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | |
| | § | **CIVIL ACTION NO. 3:24-cv-0477** |
| **UNIVERSITY OF TEXAS** | § | |
| **SOUTHWESTERN MEDICAL** | § | |
| **CENTER; ANGELA MIHALIC, M.D.,** | § | |
| **ARLENE SACHS, PH.D., ANDREW** | § | |
| **LEE, M.D.;  KEVIN KLEIN, M.D.; and** | § | |
| **MEMBERS OF THE STUDENT** | § | |
| **PROMOTIONS COMMITTEE.** | § § | |
| **Defendants.** | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND

TO THE HONORABLE COURT:

COMES NOW Meera Salamah (hereinafter "Salamah" Or "Plaintiff") and files this Second Amended Complaint and Jury Demand against Defendants University of Texas Southwestern Medical Center (hereafter "UT Southwestern"), Angela Mihalic, M.D., Dean of Medical Students (hereafter "Dean Mihalic") and Kevin Klein, M.D., Arlene Sachs, Ph.D., Andrew Lee, M.D.; and Members of the Student Promotions Committee: Reeni Abraham, Dennis Burns, George DeMartino, Archana Dhar, Fred Grinnell, AJ Kirk, Benjamin Lee, Joseph Murphy, Sarah Oltmann, MaryJane Pearson, Kathleen Wilson, W. Claiborne Yarbrough, Sarah Baker, Blake Barker, Rene Galindo, Peter Michaely, Robert Rege, Norberto Rodriquez-Baez, Rubin Craig and Andrew Zinn, and respectfully shows the Honorable Court and Jury as follows:

**I.**
**INTRODUCTION AND SUMMARY OF CLAIMS**

1.      Meera Salamah is a talented, determined, and promising student who received an organ transplant and, despite extraordinary circumstances, was excelling in medical school.

2.      Ms. Salamah experienced medical complications relating to the transplant, requiring hospitalization and chemotherapy drugs to prevent organ rejection.

3.      Ms. Salamah promptly and repeatedly requested medical leave.

4.      Despite Ms. Salamah's repeated requests, UT Southwestern never granted a true medical leave that would enable her to focus entirely on her health and recovery. Although UT Southwestern agreed she was too ill to continue coursework, UT Southwestern required Ms. Salamah to take the Step 1 examination.

5.      Ms. Salamah attempted to take the examination in spite of her major medical setbacks. Due to her disability, Ms. Salamah was not physically able to study continuously or perform well on the date of the examination.

6.      When Ms. Salamah was unable to pass on the first attempt, she was dismissed. This occurred despite UT Southwestern's practice of guaranteeing students six consecutive weeks of study time and allowing non-disabled students to repeat the examination.

7.      Defendants have engaged in a continuous pattern or practice of discrimination by denying necessary medical leave and/or denying a student in good standing the opportunity to demonstrate her knowledge.

**II.**
**PARTIES**

8.      Plaintiff Meera Salamah is an individual residing in Abilene, Texas.

9.      Defendant University of Texas Southwestern Medical Center (hereafter "UT Southwestern"), is a is a public entity as defined in Title II of the ADA and a recipient of federal financial assistance that may be served with the Complaint and Summons through its administrative head, W. P. Andrew Lee, M.D.

10.     Defendant Angela Mihalic, M.D., is sued in her official capacity as Dean of Medical Students & Associate Dean of Student Affairs for UT Southwestern. In this role, she has authority over student academic policies, including authority to modify academic requirements and reinstate students. She is also sued in her individual capacity as set forth in the Third Cause of Action herein. She is also an ex officio member of the Student Promotions Committee. She may be served through UT Southwestern's administrative head, W. P. Andrew Lee, M.D.

11.     Defendant Arlene Sachs, Ph.D. is sued in her official capacity as Director of Student Academic Support Services for UT Southwestern. In this role, she has authority over determination with regard to available accommodations for students with disabilities. She is also sued in her individual capacity as set forth in the Third Cause of Action herein. She is also an ex officio member of the Student Promotions Committee. She may be served through UT Southwestern's administrative head, W. P. Andrew Lee, M.D.

12.     Defendant Kevin Klein, M.D. is sued in his official capacity as Chair of the Student Promotions Committee for UT Southwestern. In this role, he has the authority to recommend the modification of any academic policy or to waive certain requirements. He may be served through UT Southwestern's administrative head, W. P. Andrew Lee, M.D.

13.     Defendants Reeni Abraham, Dennis Burns, George DeMartino, Archana DeMartino, Fred Grinnell, AJ Kirk, Benjamin Lee, Joseph Murphy, Sarah Oltmann, MaryJane Pearson, Kathleen Wilson, W. Claiborne Yarbrough, Sarah Baker, Blake Barker, Rene Galindo,

Peter Michaely, Robert Rege, Norberto Rodriquez-Baez, Rubin Craig and Andrew Zinn are members of the Student Promotions Committee, the committee responsible for both promoting and dismissing students. The Student Promotions Committee voted to dismiss Ms. Salamah and could vote to reinstate her or otherwise permit her to continue her education. They may be served through UT Southwestern's administrative head, W. P. Andrew Lee, M.D.

14.    Defendant W.P. Andrew Lee, M.D. is the Dean of the University and retains ultimate authority for the decisions made by the school. As the Dean, Dr. Lee could reverse any decision of the Student Promotions Committee. Instead, Dr. Lee affirmed the decision of the Student Promotions Committee, despite actual knowledge of the discriminatory nature of the decision. Dr. Lee has the authority to readmit Ms. Salamah.

### III.
### JURISDICTION AND VENUE

15.    This Court has original jurisdiction to hear the complaint under 28 U.S.C. § 1331, as this action is being brought under the Americans with Disabilities Act Title II and Section 504 of Rehabilitation Act.

16.    Venue is appropriate in the Northern District of Texas, Dallas Division, because a substantial portion of the actions and/or omissions occurred in this jurisdiction as set forth by 28 U.S.C. § 1391(a)(2).

### IV.
### FACTS

#### A.  **About Ms. Salamah**

17.    Ms. Salamah is the recipient of a double lung transplant. Accordingly, she is a person who has a disability, has a record of having a disability, and is regarded as having a

disability as set forth in the Americans with Disabilities Act as Amended, and as similarly defined by the Rehabilitation Act of 1974.

18.     Recipients of organ transplants, including Ms. Salamah, can continue to experience complications and potential complications.

19.     Ms. Salamah is a capable and determined student, who has overcome many obstacles in her life. In her experience as a recipient of a lung transplant, she gained a particular desire to help others through the practice of medicine.

20.     Ms. Salamah has shown dedication, determination, and academic capability throughout her schooling. Ms. Salamah's MCAT scores were in the 97th percentile and she graduated magna cum laude, all while navigating the challenges of managing her medical condition.

21.     Ms. Salamah was admitted into the prestigious program at UT Southwestern, where she decided to attend medical school.

22.     Ms. Salamah began her career as a medical student in 2020. She successfully completed the first two years of medical school. At times, she required supplemental oxygen while she studied. Often, the fatigue from her condition limited her study hours. She overcame these challenges and received the highest mark available in every class she took.

23.     Ms. Salamah became ill due to complications of her disability during her Step 1 study period. Ms. Salamah requested one simple accommodation/modification – time to receive treatment and heal. She did not ask to be relieved of any academic requirements.

24.     On February 19, 2022, Ms. Salamah requested leave due to transplant complications and related major depressive disorder. At the time Ms. Salamah became ill, approximately half of her classmates had yet to even begin studying for the Step 1 examination.

25.     Ms. Salamah's initial request was denied, purportedly because medical leave must extend for a certain length of time. UT Southwestern required her to sit for the Step 1 examination by April 8, 2022, regardless of whether she was well enough to study for or take the examination.

26.     Ms. Salamah knew the deferral was insufficient because it did not give her enough time to recover and did not allow her any period of time without ongoing academic obligations. Ms. Salamah informed UT Southwestern that she needed additional time, as issues with her physical health were further compounded by related mental health issues. She was assured she could "take her time" in assessing her options.

27.     On March 14, 2022, it was still apparent that Ms. Salamah would be unable to return to her education as scheduled, due to ongoing complications. Ms. Salamah requested her status be changed from a deferral to medical leave. Had the proffered reason for denial of leave (insufficient length of time) been genuine, her issues should have been resolved at that time, as it was now apparent her need for leave was temporally sufficient.

28.     On March 24, 2022, Ms. Salamah submitted a formal request for accommodation due to disability, including her physician's recommendation that she receive a medical leave of absence.

29.     Disregarding Ms. Salamah's deteriorating health condition and her physician's formal recommendations, despite prompt notification of her need for additional time and reasonable follow-up contact, UT Southwestern took more than one month to review her request medical leave.

30.     On or about April 22, 2022, she was once again denied leave. She was informed she would need to sit for and pass the Step examination by June 3, 2022.

31.    In May of 2022, Ms. Salamah once again informed her advisors at UT Southwestern that the deferral was inadequate and she needed a formal medical leave of absence.

32.    Ms. Salamah was informed that the request would extend her graduation date. She promptly responded that she was aware extension would be required and she agreed to the same.

33.    Finally, after resistance, on June 6, 2022, Ms. Salamah was granted what was a "medical leave of absence" in name only for a period of seven months, through the beginning of the Spring semester of 2023. However, UT Southwestern steadfastly refused to relax the requirement to take the Step 1 examination. This requirement undermined the very purpose of medical leave.

34.    After fighting and finally obtaining a "medical leave of absence" Ms. Salamah was still expected to study during the time she was recovering from serious illness. That was not leave, and it did not accommodate her disability.

35.    UT Southwestern still required Ms. Salamah to study for and pass the USMLE Step 1 examination, regardless of how ill she was.

36.    Having no other option, Ms. Salamah attempted the Step 1 examination. In addition to the fatigue and medical side effects she faced during her study period and nominal medical leave, Ms. Salamah had a particularly challenging day during the examination. The night before the examination her lung condition made it difficult to sleep. The morning of the examination, she was experiencing difficulty breathing.

37.    Ms. Salamah did not have a fair opportunity to prepare for and take the Step 1 examination, and as a result, she failed. Ms. Salamah's difficulties with the examination were not the result of any academic lack of ability, but rather occurred due to manifestations of her disability

during her study period and the examination itself. Ms. Salamah was only unable to pass the examination because of her health challenges at the time of the examination.

38.    The examination measured her disability, rather than academic capability.

39.    Dean Mihalic and Arlene Sachs learned of her failure on the Step 1 examination. Initially, they invited her to study for and retake the examination, but Ms. Salamah's doctors at UT Southwestern informed her that she would need to be hospitalized due to her lung transplant complications.

40.    Ms. Salamah immediately requested accommodations from Dr. Mihalic and, later, from Dr. Sachs.  She requested that she be allowed to study after she was discharged from the hospital and no longer receiving high doses of cytotoxic chemotherapeutic drugs.

41.    However, as soon as they learned she was still unwell – and at this time experiencing acute rejection concerns – they immediately placed her on administrative leave, a precursor to dismissal. The decision to place Ms. Salamah on administrative leave occurred just days after she made her request for accommodations.

42.    Moreover, during Ms. Salamah's requests for leave, UT Southwestern frequently moved the targets for when her Step examination would be required, including advancing deadlines for completion, without providing sufficient notice. By way of example, when Ms. Salamah was on leave, she was informed she would have until June of 2023 to take and pass the Step examination. Instead, in approximately January of 2023, she was called by Dr. Sachs, with the knowledge of Dean Mihalic, and told she would only have until February 24, 2023 to take and pass the examination. Despite her serious ongoing medical condition, she was able to submit a request for disability accommodation.

43.     Eventually, Ms. Salamah's administrative leave was extended to February 24, 2023.

44.     Ms. Salamah was dismissed on or about March 1, 2023, purportedly for failing to pass the Step 1 examination. UT Southwestern dismissed Ms. Salamah despite her academic excellence, her ability to meet all program requirements with reasonable accommodation, the Step timing requirement not being essential to the program, and her medical clearance to return to studies. The dismissal effectively ended her medical career.

45.     Ms. Salamah exhausted all available appeals. At each phase of the appeals process, she again explained her need for accommodations/modifications on the basis of disability.

46.     Ms. Salamah is now fully able to return to her studies, but has been denied the opportunity to continue at UT Southwestern. Due to her dismissal, she is also effectively precluded from continuing her studies at another university.

47.     Defendants have acted with intent and demonstrated deliberate indifference because Defendants are aware of Ms. Salamah's medical conditions, and the required accommodations, but have failed to provide accommodations as required by law.

48.     Ms. Salamah's dismissal occurred despite her demonstrated ability to complete medical school and excel as a physician. UT Southwestern has given no reason for Ms. Salamah's dismissal other than the fact that she did not pass the Step 1 examination during a period of time when she was on approved medical leave.

49.     UT Southwestern does not offer, or in the alternative, did not offer to her, true medical leave. UT Southwestern refused to make reasonable modifications to the requirements to complete the Step examination so that Ms. Salamah would have the opportunity to study for and complete the examination while she was well.

50.    Ms. Salamah did not request at any time that UT Southwestern excuse her from completing any of the academic requirements of her program. Ms. Salamah did not request additional time during the examinations or to study, she simply requested that the time she needed medical leave not be applied in a discriminatory manner. The requested leave would essentially operate as a "pause" in her studies. The modifications requested of UT Southwestern would not require the university to lower or otherwise substantially alter the elements of the medical school program.

**B.    Ms. Salamah is qualified to pass the Step 1 examination and complete her studies.**

51.    In addition to her stellar academic record and prior success in high-stakes testing, ample evidence indicates Ms. Salamah would be likely to pass the Step 1 examination if given an opportunity similar to her non-disabled peers.

52.    The Step examination is rarely a barrier to licensing, particularly for students of competitive programs like UT Southwestern. Data released by USMLE reveals that in 2022, in excess of 90% of test takers from US Medical schools were able to pass the Step 1 examination.

53.    Those who do not pass the Step 1 examination initially have a very high likelihood of passage on another attempt. In 2022, the passage rate for repeat test takers was 76%. UT Southwestern's own policy allows for students to retake the exam once after a failed attempt. Despite this policy, UT Southwestern did not allow Ms. Salamah this second chance as it does non-disabled students.

54.    When Ms. Salamah was feeling well, she was able to pass objective, computer-scored practice examinations, even as acute illness severely limited her ability to study.

55.    Ms. Salamah was precluded from taking a second, or even a third, attempt at the examination, as her non-disabled peers would have, as she was hospitalized and on high doses of chemotherapy medication that made studying for and sitting for the examination impossible.

56.    Ms. Salamah was never allowed six weeks of continuous leave to study and take the examination, as all other UT Southwestern students are given.

57.    Ms. Salamah is now well and is able to work full-time. She would be able to pass the Step 1 examination if given the opportunity to do so.

58.    Ms. Salamah would likewise be well-positioned to complete medical school and meet all other requirements of licensing. Everything about Ms. Salamah's personal and academic history demonstrates her likelihood of success on the Step examination and ability to be licensed as a physician.

59.    By contrast, peers in her cohort who received lower marks, including multiple failing grades, were allowed to progress. Students, who were not hospitalized, were allowed to progress to their third year even after failing multiple classes and failing Step 1.

60.    Ms. Salamah is particularly poised to thrive in the second half of medical school. The later years of medical school focus more heavily on clinical skills, in which Ms. Salamah is particularly primed to excel in due to her experiences as a patient. As her physician sponsor noted, "During her time in the pediatric intensive care unit, Meera was clearly in her element; she interacted very well with the sick children and their parents, she impresses the nursing staff with her empathy and caring manner, she clearly understood many of the disease processes of patients."

61.    Ms. Salamah's physician sponsor during her internship commented that Ms. Salamah had her "highest endorsement" and " Ms. Salamah demonstrated a likelihood of success in every aspect of performance required to complete medical school. Her professors commended

her. A UTSW professor with twenty-five years of experience evaluating students stated that despite having "interacted with many students and doctors" few others show "her resilience and dedication to taking care of the sick…."

62.    The drive, determination, compassion, and resilience required to experience such significant health challenges and to emerge with a clear drive to succeed demonstrates her ability to tackle any challenge.

63.    UT Southwestern has not identified any disqualification other than the failure of the Step 1 examination.

64.    Ms. Salamah affirmatively pleads that she meets every one of the essential requirements set forth by UT Southwestern's own documentation of the essential requirements for its medical school.

65.    If Ms. Salamah is allowed a fair opportunity, she has the ability to succeed on the Step 1 examination, complete medical school, obtain her license, and practice medicine.

**C.  Patients as Physicians**

66.    Ms. Salamah is not the only patient who has used her experience of adversity to benefit others, as with minimal accommodations medical students can overcome major medical challenges and successfully practice medicine.

67.    For example, Dr. Ken Sutha, a Stanford physician who once received a transplant now provides care to those undergoing the same procedure as a board certified pediatric nephrologist at Lucile Packard Children's Hospital Stanford (LPCH) and Stanford University School of Medicine in Palo Alto, CA.

68.    Dr. Claudia Martinez was been diagnosed with Hydrocephalus (a buildup of too much cerebrospinal fluid in the brain), Trigeminal Neuralgia (a chronic pain condition that affects

the 5th cranial nerve), Adrenal Insufficiency (a condition in which the adrenal glands do not produce adequate amounts of steroid hormones) and Tethered Brainstem (where the brainstem becomes pinned to the dura, the outer covering of the brain). She graduated from medical school and practices medicine despite undergoing six major brain surgeries, four feeding tube surgeries, five shunt surgeries, multiple procedures, and diagnostic tests. This included a procedure that untethered the outer lining of her brain from its stem, returning her cranial nerves to normal. As part of her recovery from this challenging condition, she overcame neurological deficits, including motor difficulties.

69.    Dr. Mark Goh, also a transplant recipient, is double-board certified physician. In addition to practicing as an anesthesiologist, he enjoys playing ice hockey and snowboarding.

70.    Dr. Nathan Baggett underwent three liver transplants in less than two years, all while attending medical school. Initially, he planned to undertake the transplant, take a year off to recover and then resume his medical training. But a few days after his surgery, the artery that supplies blood to the liver clotted, damaging his new liver and causing his health to deteriorate rapidly. Rather than returning to school, he waited four months for a new transplant. Finally, he was able to receive the transplant from a deceased donor and his health stabilized. Despite these challenges, he completed medical school and is now serving a residency in emergency medicine in Minnesota.

71.    Dr. Alin Gragossian was diagnosed with familial dilated cardiomyopathy at the same hospital where she was in her third year of her emergency medicine residency. Due to the extreme medical urgency created by the disease, she required and received a heart transplant shortly after her diagnosis. She was able to continue her studies and pursued a 2-year multidisciplinary fellowship in Critical Care Medicine at The Mount Sinai Hospital in New York

City. During this period, she focused in the high-stakes realm of Cardiac Intensive Care and Cardiothoracic Intensive Care. Her experiences in these environments equipped her with a unique insight into the intricacies of managing critical cardiac conditions.

72.    Throughout the country, medical students and physicians in all stages of practice experience medical events ranging in severity from minor, temporary illness to acute, chronic conditions. Statistics demonstrate that one-quarter of the population will experience disability at some point before retirement. Recognizing that medical needs are universal, it is typical for medical schools and employers of physicians to provide such accommodations.

### D.  UT Southwestern's Proffered Reason for Dismissal is Discriminatory

73.    UT Southwestern has alleged in this litigation that it requires candidates to pass the USMLE Step examinations within one year, although Ms. Salamah does not concede that is a uniformly enforced policy. To the extent this is an enforced policy of the university, it is not an essential function as defined by UT Southwestern's own standards, nor is it an academic requirement of the university.

74.    UT Southwestern's Appendix of essential functions requires candidates to "meet the legal standards to practice medicine in the State of Texas." It does not require students to pass the USMLE Step examinations within any set period of time. Ms. Salamah was able to meet the essential functions as set forth by UT Southwestern.

75.    The Texas Medical Board retains ultimate authority to assess the competency of aspiring doctors. Texas Medical Board alone has the authority to determine whether a license should be granted or revoked within the State of Texas.

76.    Admission by the Texas Medical Board evaluates candidates based on the following eight criteria: graduation from medical school, medical clerkships, postgraduate

training, the Texas Medical Jurisprudence Examination, active practice of medicine, disciplinary history, criminal history, number of examination attempts, time frame for examination attempts, and "other factors" as defined by the Board.

77.     Students may meet licensing requirements by passing several different examinations, most typically the Comprehensive Osteopathic Medical Licensing Examination ("COMLEX") or the United States Medical Licensing Examination ("USMLE").

78.     The USMLE is the primary standardized national examination used by the state boards throughout the country. The USMLE offers three "Step" examinations. Two of the Step examinations are taken within medical school and the final examination is taken during residency.

79.     The Texas Medical Board places only minimal limitations on the number of attempts which may be made to pass the USMLE or comparable examinations. The Texas Medical Board allows candidates to take each Step examination at least three times, and may allow certain candidates up to six attempts.

80.     The Texas Medical Board allows a generous amount of time to pass USMLE Step or comparable examinations. Candidates have at least seven years to pass the examinations, and in certain circumstances the seven-year period may be extended to ten years, or even entirely waived.

81.     The Step examinations are neither written nor administered by UT Southwestern. UT Southwestern has no control over the academic requirements of either the USMLE or the Texas Medical Board.

82.     UT Southwestern has explicitly stated that students must meet all technical and academic requirements *before* admission. Thus, the standards are the same for admission and promotion.

83.     Ms. Salamah wrote about her condition to UT Southwestern upon admission. UT Southwestern faculty, as doctors at a top ten transplant center in the country, are acutely aware of whether a lung transplant patient would be qualified for UT Southwestern's program.

84.     The accommodation/modification Ms. Salamah sought was the opportunity to briefly pause her studies while she addressed her medical needs. Ms. Salamah did not ask for relief from the requirement to pass the examination, additional time to study while she was well, an additional number of attempts at passing the examination, nor did she in any way ask UT Southwestern to relax its academic standards.

85.     Moreover, the requested accommodation/modification would not have put her substantially out of alignment with her peers. Students at UT Southwestern generally take the Step examinations at different times in their course of study, based on "pathway" assignments. Depending on a student's pathway, they may have zero, one, or two clinical rotations before attempting the Step 1 examination.

86.     Accordingly, UT Southwestern has failed to show a non-discriminatory reason for the denial of the requested leave or for Ms. Salamah's dismissal.

**V.**

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION - VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**
**(As to UT Southwestern)**

87.     Plaintiff realleges and incorporates by reference the foregoing paragraphs.

88.     Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794 et seq., states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under any program, service or activity

receiving federal financial assistance or under any program or activity conducted by any Executive agency."

89.    Plaintiff's status as an organ transplant recipient qualifies as disabilities for purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

90.    UT Southwestern is a recipient of federal financial assistance. UT Southwestern receives federally subsidized tuition, research grants, funding from CMS, and other sources of federal financial assistance.

91.    Section 504 of the Rehabilitation Act requires covered entities to provide reasonable accommodations/modifications to individuals with disabilities so they can fully participate in benefits administered with federal funding.

92.    Section 504 of the Rehabilitation Act prevents the "exclusion" of students with disabilities.

93.    UT Southwestern has failed to provide reasonable accommodations and excluded students with disabilities in conduct including, but not limited to, the following:

   a.  Requiring a minimum length of illness to enable leave to be taken;

   b.  Requiring students on academic leave to continue to study for and pass state licensing exams, although that is not a requirement of either the Texas Board of Medical Examiners, nor is it a requirement of the administrators of the examinations;

   c.  Taking an excessive amount of time and requiring excessive documentation in evaluating student requests for medical leave;

   d.  Requiring excessive documentation in an unreasonable timeframe from students with disabilities;

e.  Failing to provide an academic remediation plan, although such plans are available to students without disabilities;

f.  Failing to make modifications to internal policies regarding medical leave documentation while students are incapacitated by medical issues;

g.  Dismissing students with otherwise satisfactory performance due to the utilization of medical leave; and

h.  Retailiating against Ms. Salamah after she made a request for accommodation/modification.

94.    Each of the above resulted in Ms. Salamah being excluded from, denied the benefits of, and being subjected to discrimination by the UT Southwestern medical school.

95.    Ms. Salamah was excluded from medical school solely as a result of her disability. Had she not been disabled, she would have been able to pass the Step 1 examination. Ms. Salamah would have been likely to pass on the first attempt had she not experienced symptoms of her disability during the study period and during the exam.

96.    Whereas her non-disabled peers who do not pass the examination are regularly allowed to retake the examination and receive support, Ms. Salamah was not given any opportunity to study for examination for an equivalent length of time, as she was dismissed prior to a second attempt.

97.    As a result of Defendants' violations, Ms. Salamah suffered and continues to suffer damages and requires injunctive relief.

## SECOND CAUSE OF ACTION –
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT – TITLE II
### (As to Individual Official Capacity Defendants)

98.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

99.    UT Southwestern is a branch of state government, or in the alternatively, is an instrumentality of the state, subject to Title II of the ADA in its administration of federal funds. 42 U.S.C. § 12131(1)(a); 28 C.F.R. § 35.104.

100.    Title II of the ADA, 42 U.S.C. § 12132, states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

101.    Defendant may not "utilize criteria or methods of administration … [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R § 35.130(b)(3)(i).

102.    Public entities, such as Defendant, must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i).

103.    Students must be tested on their knowledge and skill, rather than excluded on the basis of disability.

104.    Ms. Salamah is a qualified person with a disability, as that term is defined in the ADA and the ADA Amendments Act of 2008, as she was substantially limited in major life activities as a result of her lung transplant and depression, each of which would independently qualify as disabilities, and had a record of such limitations. During the relevant timeframe, she had difficulty breathing and maintaining adequate oxygen intake and was therefore unable to perform even basic activities of daily living such as dressing, preparing food, cleaning, and, course, to study.

105.     UT Southwestern's medical school is a service, program, or activity, within the definition of Title II of the Americans with Disabilities Act.

106.     UT Southwestern's policies, as implemented and enforced by the invidual defendants in their official capacities, discriminate against students with disabilities, including Ms. Salamah, in several ways, including, but not limited to:

a.  Requiring a minimum length of illness to enable leave to be taken;

b.  Requiring students on academic leave to continue to study for and pass state licensing exams, although that is not a requirement of either the Texas Board of Medical Examiners, nor is it a requirement of the administrators of the examinations;

c.  Taking an excessive amount of time and requiring excessive documentation in evaluating student requests for medical leave;

d.  Requiring excessive documentation in an unreasonable timeframe from students with disabilities;

e.  Failing to make modifications to internal policies regarding medical leave documentation while students are incapacitated by medical issues; and

f.  Dismissing students with otherwise satisfactory performance due to the utilization of medical leave.

107.     As a result of Defendants' violations, Ms. Salamah suffered and continues to suffer damages and requires injunctive relief.

108.     Among other things, UT Southwestern's status as "dismissed" precludes her from continuing her medical education at any institution.

109.    The members of the Student Promotions Committee, in conjunction with the Dean, have the ability to modify policies and procedures, to enable re-enrollment, and to provide relief to Ms. Salamah that would enable her to continue her medical education at UT Southwestern or elsewhere.

110.    In the alternative, at statement by the Student Promotions Committee, Dr. Klein, Dean Lee, and/or the other individually named Defendants which clarifies the reasons for Ms. Salamah's dismissal would prevent the dismissal from operating as a complete bar to the continuation of Ms. Salamah's studies at another institution.

111.    Title II authorizes this Court to award reasonable attorneys' fees as part of the costs. 42 U.S.C. § 12133; 29 U.S. Code § 794a(b).

### THIRD CAUSE OF ACTION
### ADA RETALIATION
### (AS TO ANGELA MIHALIC, M.D. AND ARLENE SACHS AS INDIVIDUALS)

112.    Plaintiff realleges and reincorporates each other paragraph herein.

113.    It is unlawful to "interfere with any individual in the exercise or enjoyment of" any right protected under the ADA. 42 U.S.C. § 12203(b); 28 C.F.R. § 35.134(b).

114.    In the winter of 2023, Ms. Salamah informed Dean Mihalic and Arlene Sachs of her continued disability and concerns of organ rejection.

115.    Prior to sharing this information, Ms. Salamah had been told she would have the opportunity to retake the Step 1 examination and that she would have until June of 2023 to obtain a passing score.

116.    After sharing the information regarding her continued need for accommodation, Dean Mihalic and Arlene Sachs immediately placed Ms. Salamah on administrative leave, a precursor to dismissal.

117.    On information and belief, Dean Mihalic and Arlene Sachs then made the determination that Ms. Salamah was required to pass the examination by February of 2023, despite actual knowledge that Ms. Salamah had major medical complications that would not enable her to study and the prior determination that she would have had until June of 2023.

118.    Advancing Ms. Salamah's deadline to pass the examination and denying necessary medical leave were deliberately indifferent or intentional acts.

## VI.
### JURY TRIAL DEMAND

119.    Plaintiff hereby demands a trial by jury.

## VII.
### PRAYER FOR RELIEF

120.    WHEREFORE, for the foregoing reasons, Plaintiff prays that this Court grant judgment in her favor, and against Defendants, as follows:

    a.    Award injunctive relief so Plaintiff may be reinstated as a student, or otherwise be permitted to continue her studies;

    b.    Award damages against Defendants as is proper under law, including but not limited to compensatory damages, nominal damages and damages for stigmatic injury;

    c.    As a result of the actions and omissions alleged herein, pursuant to Section 504 of the Rehabilitation Act only, Ms. Salamah is entitled to monetary damages, including the ongoing obligation to repay student loans, which she incurred on the reliance she would have a reasonable opportunity to complete her education, and which she is unable to repay without completing her medical education;

    d.   Pursuant to Section 504 of the Rehabilitation Act only, award declaratory relief such that policies discriminating against students with disabilities be revoked and/or replaced with non-discriminatory policies.

    e.   Award Plaintiff her costs and attorneys' fees, litigation expenses and costs incurred herein; and

    f.   Grant other relief as this Court deems just and proper.


Date: November 26, 2024               Respectfully Submitted,

                                     */s/ S. Tomiyo Stoner, Esq.*
                                     S. Tomiyo Stoner, Esq.
                                     Tex. & S.D. Tex. Bar No.:  24103950
                                     UNDAUNTED LAW FIRM, P.C.
                                     400 E. Las Colinas Blvd. Suite 491
                                     Irving, Texas 75039
                                     Phone: 844-232-4332
                                     E-mail: tstoner@undauntedlaw.com
                                     Attorney for Plaintiff Meera Salamah