IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MEERA SALAMAH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Civil Action No. 3:24-CV-0477-D |
| | § | |
| UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER, et al., | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

This is an action by plaintiff Meera Salamah ("Salamah")—a former medical student who was dismissed from the medical school at defendant University of Texas Southwestern Medical Center ("UT Southwestern") when she failed to pass the USMLE Step-1 Examination ("Step 1") within one year of the end of an allotted study period—alleging disability-based failure-to-accommodate claims. Salamah asserts that UT Southwestern failed to reasonably accommodate her disabilities, in violation of § 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq.*, and that the individual defendants—Angela Mihalic, M.D. ("Dr. Mihalic"), Kevin Klein, M.D., Arlene Sachs, Ph.D. ("Dr. Sachs"), and Andrew Lee, M.D., acting in their official capacities—also failed to reasonably accommodate her disabilities, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*. Defendants move for summary judgment on all of Salamah's claims. Concluding that a reasonable jury could not find in Salamah's favor

on any of her claims, the court grants the motion and dismisses this action with prejudice.

I

Salamah is the recipient of a double-lung transplant and suffers from major depressive disorder.[1] Despite her medical challenges, she completed her undergraduate studies with an outstanding GPA. Combined with a high score on the MCAT, Salamah qualified for admission to the medical school at UT Southwestern, which is among the top medical schools in the nation.[2] Although Salamah's medical issues presented challenges, with accommodations she was able to complete her first phase of medical school studies.

Before she began her second phase of studies, however, UT Southwestern dismissed her. UT Southwestern requires medical students to pass the USMLE Step-1 Examination ("Step 1") within one year of the end of an allotted study period. When Salamah failed to do so, UT Southwestern dismissed her.

UT Southwestern's medical student program is divided into three distinct, sequential phases: pre-clerkship, clerkship, and post-clerkship. The pre-clerkship phase focuses on building foundational "knowledge in basic and clinical sciences." Ds. App. (ECF No. 69-1) at 6. During the clerkship phase, students interact with real patients and apply the knowledge

---

[1]In recounting the factual background, the court summarizes the evidence in the light most favorable to Salamah as the summary judgment nonmovant and draws all reasonable inferences in her favor. *See, e.g.*, *Owens v. Mercedes-Benz USA, L.L.C.*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'm v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

[2]Unless otherwise indicated, all references to "UT Southwestern" are to the medical school.

that they learned in the pre-clerkship phase. Between these phases, students are required to sit for Step 1, which is a general knowledge exam of the concepts learned in the pre-clerkship phase. *Id.* at 7. Passing Step 1 demonstrates that a student has the "fundamental, foundational knowledge to see patients[.]" *Id.* at 6.

UT Southwestern imposed two relevant Step 1 requirements: first, students must pass Step 1 within one year after their six-week study period ended; and, second, if a student took an approved leave of absence, UT Southwestern required the student to "have a passing score . . . prior to [her] return[.]" *Id.* at 50. Although UT Southwestern did not require students to pass Step 1 on their first attempt, those who failed could not enroll in additional clerkships until they received a passing score.

Salamah successfully completed her pre-clerkship phase in 2022. But at the beginning of her study period for Step 1, Salamah experienced an episode of major depressive disorder. She requested an accommodation, and UT Southwestern "deferred" her "deadline to sit" for Step 1 "to April 8, 2022[.]" *Id.* at 77. This deferral was the first of three medical accommodations that UT Southwestern granted to Salamah.

In March, Salamah twice requested extensions due to her major depressive disorder and medical issues. UT Southwestern initially extended the deadline for Salamah to sit for Step 1 to June 3, 2022. Then, in response to a second request, UT Southwestern permitted Salamah to further delay her first Step 1 attempt until November 16, 2022, at the latest, and restart her course work on January 2, 2023. This constituted a full medical leave of absence. But in granting the request, UT Southwestern still required Salamah to "sit for USMLE Step

1" and "have a passing score" before returning. *Id.* at 85-86.

Salamah sat for Step 1 on November 20, 2022 and failed to receive a passing score. Upon learning on December 7, 2022 of her failure, Salamah requested a further extension to delay her return to February 24, 2023. On this occasion, Salamah requested administrative leave rather than medical leave. Although UT Southwestern granted the request, it continued to inform Salamah that she must pass Step 1 before returning to school. This time, however, Salamah's new return date also coincided with the end of her overall one-year period to pass Step 1. UT Southwestern informed her of this.

The accommodations just described are the undisputed accommodations requests that UT Southwestern granted. Each of Salamah's accommodation requests complied with UT Southwestern's "Accommodations Process," as outlined in its policy handbook. *Id.* at 52. UT Southwestern instructs students to begin the accommodation process with their designated "Learning Specialist." *Id.* at 53-54. The Learning Specialist is responsible for collecting documents and sending them to UT Southwestern's Academic Accommodations Advisory Committee ("AAAC"), which makes the ultimate recommendation. Salamah's assigned Learning Specialist was Dr. Sachs.

On December 30, 2022, a few weeks after learning she had failed Step 1, Salamah called Dr. Sachs. Neither remembers the details of this conversation. Immediately after the call, Dr. Sachs sent Salamah the three forms that she needed to complete (as she had always done) to "apply" for further accommodations. *Id.* at 95. Dr. Sachs never received these forms back.

According to the summary judgment evidence, little happened thereafter from UT Southwestern's perspective. Salamah did not submit any documentation to Dr. Sachs, and she did not sit for, or pass, Step 1. Dr. Mihalic later wrote that, during this time, Salamah "did not respond to communications from [UT Southwestern] on requirements before returning from leave." P. App. (ECF No. 71-1) at 25. She did, however, submit one of the three required forms to her medical provider, Preston Wiles, M.D. ("Dr. Wiles"), for him to complete.[3] Dr. Wiles never submitted the forms either. And, finally, unbeknownst to UT Southwestern, Salamah began experiencing a host of medical issues, including cervical dysplasia, possible transplant rejection, and an infection. This culminated in a hospitalization sometime after February 13, 2023.

In February, UT Southwestern informed Salamah that, due to her inability to pass Step 1 within the one-year requirement, she had two options: choose "to withdraw from class" or be "dismissed from the class by the Student Promotions Committee[.]" Ds. App. (ECF No. 69-1) at 104. Salamah chose a third course: send a letter to the Student Promotions Committee detailing her conditions and request a medical accommodation extending the 1-year deadline to June 2023.

Salamah's medical leave ended on February 24, 2023. The Student Promotions Committee met one week later, on March 1, and determined that she was ineligible to continue the program. Salamah unsuccessfully appealed this decision. She then brought the

---

[3]Dr. Wiles is also a faculty member at UT Southwestern.

instant suit, alleging that UT Southwestern's refusal to extend the one-year Step 1 passage requirement was a failure to reasonably accommodate her disabilities under the ADA and Rehabilitation Act. UT Southwestern moves for summary judgment, which Salamah opposes. The court has heard oral argument.

II

When summary judgment movants will not have the burden of proof on a claim at trial, they can obtain summary judgment by pointing to the absence of evidence on any essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Once the moving parties do so, the nonmovant must go beyond her pleadings and designate specific facts to demonstrate that there is a genuine issue of material fact for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial. *TruGreen LandCare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory when the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

III

Salamah seeks to recover on failure-to-accommodate claims brought under the ADA

and the Rehabilitation Act.[4]

> The ADA is a "broad mandate" of "comprehensive character" and "sweeping purpose" intended "to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life." Title II of the ADA focuses on disability discrimination in the provision of public services. Specifically, Title II, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."
>
> Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding. Like Title II, § 504 provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."
>
> The ADA and the Rehabilitation Act generally are interpreted

---

[4]To the extent that Salamah intends to advance a disparate treatment theory, she has waived it due to her failure to include it in her summary judgment response. *Clayton v. U.S. Xpress, Inc.*, 538 F.Supp.3d 707, 713 (N.D. Tex. 2021) (Lindsay, J.).

Similarly, Salamah has failed to contest any claim proceeding under a standard discrimination theory. *See, e.g.*, *Shaikh v. Tex. A&M Univ. Coll. of Med.*, 739 Fed. Appx. 215, 219 (5th Cir. 2018) (per curiam). In fact, she has failed to respond to UT Southwestern's assertion that her "main claims [fell] under a failure-to-accommodate theory[.]" Ds. Br. (ECF No. 69) at 13. Salamah solely argues an accommodation theory in her response (although she does at one point cite the standard for discrimination). P. Resp. (ECF No. 71) at 17. She continued on this same path at oral argument. Hr'g. Tr. at 8-10.

Regardless, to the extent it is contested, Salamah has failed to produce "evidence demonstrating that [UT Southwestern's] decision to exclude her from the program was based on her disability[,]" whether "direct or circumstantial[.]" *Maples v. Univ. of Tex. Med. Branch at Galveston*, 901 F.Supp.2d 874, 880 (S.D. Tex. 2012). The court therefore grants defendants' motion as to any claims that Salamah bases on a theory of disability discrimination.

> *in pari materia*. Indeed, Congress has instructed courts that "nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the Rehabilitation Act . . . or the regulations issued by Federal agencies pursuant to such title."

*Frame v. City of Arlington*, 657 F.3d 215, 223-24 (5th Cir. 2011) (alterations in original).

To prevail on her failure-to-accommodate claims under both statutes, Salamah must prove that: (1) she "is a qualified individual with a disability; (2) the disability and its consequential limitations were known by [UT Southwestern]; and (3) [UT Southwestern] failed to make reasonable accommodations for such known limitations." *Feist v. La., Dep't of Just., Off. of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (footnote and internal quotation marks omitted). At the summary judgment stage, of course, she is only obligated to raise a genuine issue of material fact regarding her failure-to-accommodate claims. *See, e.g.*, *Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.).

IV

Salamah's lawsuit is based on two requests for accommodations: first, the December 30, 2022 phone call with Dr. Sachs; and, second, the February 2023 letter to the Student Promotions Committee.[5]

---

[5]To the extent that Salamah relies on requests for accommodations made prior to these dates to establish violations of the ADA and Rehabilitation Act, she has waived these claims because of their absence from her summary judgment response. *Clayton*, 538 F.Supp.3d at 713.

A

The court first addresses Salamah's phone call with Dr. Sachs on December 30, 2022.[6] Salamah cannot prevail on Rehabilitation Act and ADA claims based on this request because she failed to engage in an interactive process. When a plaintiff makes "a request for an accommodation . . . it may be necessary" to "initiate an informal, interactive process with the qualified individual . . . in order to craft a reasonable accommodation." *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1999) (quoting 29 C.F.R. § 1630.2(o)(3)). Failure to do so may result in liability if there is a deprivation of a reasonable accommodation. *Id.*

But the duty runs both ways: if Salamah "is responsible for the breakdown in the interactive process, [UT Southwestern] cannot be found" liable. *Holland v. Shinseki*, 2012 WL 162333, at *9 (N.D. Tex. Jan. 18, 2012) (Boyle, J.) (citing *Loulseged*, 178 F.3d at 736). Plaintiffs are responsible for a breakdown in the interactive process when they fail to upload requested documents. *Hoskins v. GE Aviation*, 803 Fed. Appx. 740, 745 (5th Cir. 2020) (per curiam); *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 482 (5th Cir. 2016); *Callies v. Donahoe*, 2014 WL 4215370, at *6 (S.D. Tex. Aug. 25, 2014); *see also Loulseged*, 178 F.3d at 737-41 ("One cannot negotiate with a brick wall").

[6]The court distinguishes these two requests because they bear substantial differences. As to the December request, its exact grounds and nature are unclear because neither party remembers the phone call and Dr. Sachs never received the documentation. By contrast, in February, Salamah's medical situation had significantly evolved, and the nature of her request was clear.

In the present case, a reasonable jury could only find that Salamah is "responsible for the breakdown in the interactive process[.]" *Holland*, 2012 WL 162333, at *9. After the December 30 phone call, Dr. Sachs sent three forms for Salamah to fill out and return. These forms would substantiate Salamah's request so that UT Southwestern could provide reasonable accommodations. And these were the same three forms previously used on numerous occasions.

But Dr. Sachs never received the forms. And although Salamah requested Dr. Wiles's help with one of the three required forms, it was her responsibility to ensure that all three forms were sent to Dr. Sachs. In fact, Dr. Mihalic later wrote that UT Southwestern had difficulty connecting with Salamah at all during this period. Accordingly, defendants "cannot be held liable" based on the December 30, 2022 phone call because a reasonable jury could not find that Salamah engaged in the interactive process. *See Lacount v. Tex. A&M Univ.*, 2024 WL 3070192, at *3 (S.D. Tex. June 20, 2024); *Anderson*, 477 U.S. at 248.

B

Salamah also relies on her February letter to the Student Promotions Council.

1

Salamah must prove that the February letter to the Student Promotions Council made her "disability and its consequential limitations . . . 'known'" to UT Southwestern. *Feist*, 730 F.3d at 452. She bears the "burden" of proving that she "request[ed] an accommodation in 'direct and specific' terms," because federal law does not require "clairvoyance." *Windham v. Harris Cnty.*, 875 F.3d 229, 236 (5th Cir. 2017) (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47

F.3d 928, 934 (7th Cir. 1995), and *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001)). If Salamah fails to do so, she "can prevail only by showing that" her disability was "'open, obvious, and apparent' to the entity's *relevant agents*." *Windham*, 375 F.3d at 237 (emphasis added) (quoting *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 164 (5th Cir. 2017)).

Moreover, Salamah's burden on this element is impacted by the fact that UT Southwestern is a university. *See Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1032 (5th Cir. 2022). The ADA and the Rehabilitation Act place a burden on universities to "carefully weigh . . . requested accommodations" and engage in an "interactive process" with students. *Id.* at 1033. Given the number of students and the complexity of requests, universities "cannot maintain" this "interactive accommodations process without centralizing requests" in a particular office. *Id.* Therefore, to avoid chaos, students "must bring [their] request[s] for accommodations to [that] office." *Molosso v. Bd. of Supervisors Univ. of La. Sys.*, 2026 WL 799509, at *5 (5th Cir. Mar. 23, 2026) (per curiam) (unpublished opinion). To require otherwise—to allow students to submit requests to whomever they please—would subject universities to "'an alternative, undocumented' process, introducing disarray." *Pickett*, 37 F.4th at 1033.

Case law applying these principles is limited. In *Pickett* the Fifth Circuit affirmed a dismissal when the plaintiff's "verbal, *ad hoc* requests" were made to a single faculty member. *Id.* at 1032. And in *Molosso* the Fifth Circuit affirmed summary judgment when the plaintiff merely discussed accommodations with an instructor and a professor. *Molosso*, 2026 WL 799509, at *1. In both cases, the universities created a centralized

accommodations process that the plaintiff knew about but failed to utilize. *Id.* at *5; *Pickett*, 37 F.4th at 1033; *cf. Doe v. Tex. A&M Univ.*, 634 F.Supp.3d 365, 381-82 (S.D. Tex. 2022) (holding that conversations with a "Program Director" and "Dean of the College of Education" were sufficient to withstand a motion to dismiss when the complaint did not allege a centralized accommodation process).

In the present case, the court, interpreting *Pickett*, has held that failure to follow a centralized procedure is fatal to a plaintiff's claim when, "*as a result*, the institution cannot reasonably be charged with knowledge[.]" *Salamah v. Univ. of Tex. Sw. Med. Ctr.* (*Salamah II*), 2025 WL 1211124, at *10 (N.D. Tex. Apr. 25, 2025) (Fitzwater, J.) (emphasis in original).[7] In *Molosso* the district court (which was later affirmed) relied on this interpretation and held on summary judgment that the plaintiff's failure to contact the "centralized entity" did indeed mean that "the institution [could not] reasonably be charged with knowledge[.]" *Molosso v. Bd. of Supervisors Univ. of La. Sys.*, 2025 WL 1660389, at *9 (W.D. La. June 11, 2025), *aff'd*, 2026 WL 799509 (5th Cir. Mar. 23, 2026). The inquiry set out in *Pickett* and applied in *Molosso*, however, does not require plaintiffs to adhere to minute technical requirements; but it does require that plaintiffs at least contact the

[7]The court held in *Salamah II* that, "on the face of the complaint," UT Southwestern had not shown that it could not reasonably be charged with knowledge. *Salamah II*, 2025 WL 1211124, at *10. Importantly, the operative complaint in *Salamah II* alleged that the "members of the Student Promotions Committee . . . have the ability to modify policies and procedures [and] to enable re-enrollment[.]" SAC (ECF No. 24) at 21. It also alleged that Dr. Mihalic had "authority to modify academic requirements and reinstate students." *Id.* at 3. But the summary judgment record, which is not confined to the face of the complaint, supports different conclusions.

designated entity or its substantial equivalent so as to "reasonably" charge a university "with knowledge." *Salamah II*, 2025 WL 1211124, at *10; *see also Smith v. Harris Cnty*, 956 F.3d 311, 318 (5th Cir. 2020) (restating general rule that considers whether "relevant agents" were aware of the disability).

Accordingly, Salamah must present sufficient evidence for a reasonable jury to find that she requested an accommodation in "direct and specific" terms according to the guidance in *Pickett*, or that her disability was "open, obvious, and apparent" to UT Southwestern's "relevant agents." *Pickett*, 37 F.4th at 1033; *Windham*, 875 F.3d at 237 (quoting *Taylor*, 93 F.3d at 164).

2

A reasonable jury could not find that Salamah informed UT Southwestern in "direct and specific" terms "so that [her] disability and its consequential limitations were 'known'" to UT Southwestern. *Windham*, 875 F.3d at 237; *Feist*, 730 F.3d at 452. The court considers only Salamah's February letter to the Student Promotions Committee for this inquiry.[8]

There is no question that this letter was outside UT Southwestern's centralized

---

[8]For several reasons, Salamah's requests and communications prior to the February letter are not evaluated to determine whether UT Southwestern had knowledge of her disability: (1) Salamah's health issues had evolved in February so as to be totally novel; (2) her most recent leave was administrative rather than medical; and (3) in February, Salamah for the first time requested an extension to the requirement that she pass Step 1 within one year. Therefore, to the extent that Salamah contends that UT Southwestern had general knowledge sufficient to trigger duties under the ADA and Rehabilitation Act, the court declines to accept this contention.

process.[9] *Compare* Ds. App. (ECF No. 69-1) at 5-8, 10-11 (detailing accommodations process) *with* P. App. (ECF No. 71-1) at 72-78 (detailing role of the Student Promotions Committee). Salamah admitted as much in her deposition. Ds. App. (ECF No. 69-1) at 28. Therefore, a reasonable jury could not find that Salamah followed UT Southwestern's "centralized process." *Molosso*, 2026 WL 799509, at *5.[10]

And this letter, although detailed, is also insufficient to "reasonably" charge UT Southwestern's relevant agents "with knowledge." *Salamah II*, 2025 WL 1211124, at *10. The court has not located relevant authorities that address whether a written request to the incorrect committee (rather than the verbal requests made to individual faculty in *Pickett* and *Molosso*) is sufficient to reasonably charge a university with knowledge. Nevertheless, the relevant legal principles, combined with the circumstances of this case, support the conclusion that the February letter was insufficient as a matter of law. *See Pickett*, 37 F.4th at 1032-33; *Molosso*, 2026 WL 799509, at *5-6.

The summary judgment evidence reflects stark differences between UT

---

[9]Salamah maintains that "UTSW cannot demonstrate . . . that Salamah actually failed to complete the EDU-103 form" and that "UTSW offers no testimony indicating that the EDU-103 form was incomplete when sent to Dr. Wiles." P. Resp. (ECF No. 71) at 19. This argument appears to confuse the question whether Salamah filled in the forms with whether Dr. Sachs received the forms, which is the relevant locus for this inquiry. And UT Southwestern *has* introduced evidence that this failed to occur.

[10]To the extent that Salamah argues that internal inconsistencies within UT Southwestern's centralized accommodations process violated the ADA and Rehabilitation Act, this is insufficient. *Montana v. Donahoe*, 2011 WL 3862213, at *11 (W.D. Tex. Sept. 1, 2011) ("In fact, an employer's failure to comply with its own policies does not itself constitute a violation of the Rehabilitation Act.").

Southwestern's centralized accommodations process and the Student Promotions Committee. UT Southwestern's policy handbook grants the AAAC *exclusive* authority to review accommodations. And "[o]nly the Learning Specialist, in consultation with the AAAC, may approve a medical leave of absence." Ds. App. (ECF No. 69-1) at 55. This is, after all, why all of Salamah's prior accommodations requests were approved in this manner. *See id.* at 126-32.

By contrast, the "Student Promotions Committee [reviews] the progress of all students at the conclusion of each semester to determine if they have demonstrated appropriate mastery of all required ob[j]ectives and competencies." P. App. (ECF No. 71-1) at 72. This authority includes reviewing "possible action, up to and including dismissal" for a student's failure to meet the various Step Exam requirements. Ds. App. (ECF No. 69-1) at 49. But there is no evidence in the summary judgment record that would enable a reasonable jury to find that the Student Promotions Committee had the power to grant or review accommodations requests. Indeed, UT Southwestern went so far as to clarify on the "SPC Policy" form that "[s]tudents seeking modification of the requirements [to this policy] due to medical condition or disability must submit a request for accommodation in accordance with EDU-103[,]" i.e., the Learning Specialist and AAAC process described above. *Id.* In essence, UT Southwestern *expressly* informed students *not* to bring accommodation requests to the Student Promotions Committee.

In reviewing these facts, the court takes into account the administrative structure that UT Southwestern created to comply with federal law, as the Fifth Circuit has instructed. *See*

*Pickett*, 37 F.4th at 1032-33; *Molosso*, 2026 WL 799509, at *5-6. Essentially, the court recognizes that UT Southwestern must create a variety of committees to address its legal obligations *and* to carry out neutral administrative tasks, like dismissing students for failing to meet program requirements. Under *Pickett* the court should be reticent to disturb that structure. *Pickett*, 37 F.4th at 1032-33.

Holding UT Southwestern liable for requests sent to the Student Promotions Committee would judicially impose an "alternative" process, introducing "disarray" where UT Southwestern had once created order. *See Pickett*, 37 F.4th at 1033. UT Southwestern clearly delineated authority to the AAAC and directed students away from the Student Promotions Committee. *Compare* Ds. App. (ECF No. 69-1) at 5-8, 10-11 (detailing accommodations process) *with* P. App. (ECF No. 71-1) at 72-73 (detailing role of the Student Promotions Committee). There was therefore an "appropriate" way "for [Salamah] to request an accommodation[,]" one that she did not utilize. *Molosso*, 2026 WL 799509, at *5.

Holding otherwise would allow students to halt neutral administrative processes with misdirected, last-second "accommodation requests." Indeed, judges of this court have granted summary judgment based on temporal concerns alone. *See Green v. Medco Health Sols. of Tex., L.L.C.*, 947 F.Supp.2d 712, 728 (N.D. Tex. 2013) (Boyle, J.) ("In situations where an employee's termination based on a legitimate, nondiscriminatory has been made effective but has not yet been processed, courts must not permit the employee to use the ADA as a shield from being fired by suddenly requesting an accommodation"); *Grodman v. Tex. Tech Univ. Health Scis. Ctr.*, 816 F.Supp.3d 602, 620 (N.D. Tex. 2025) (Hendrix, J.)

(same, but applied to universities). When a university expressly tells students *not* to send accommodations requests to a particular office, the court will not impose liability for communications sent to that office.

Accordingly, the court holds that Salamah has failed to introduce sufficient evidence for a reasonable jury to find that the letter to the Student Promotions Committee "identified [her] disabilities as well as the resulting limitations . . . in direct and specific terms" so as to charge UT Southwestern with knowledge. *See Smith*, 956 F.3d, at 317.

3

Salamah can also generally show that "the disability and its consequential limitations were known by" UT Southwestern if "'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's *relevant agents*." *Id.* (emphasis added) (quoting *Taylor*, 93 F.3d at 165). But as discussed above, Salamah has not introduced sufficient evidence for a reasonable jury to find that she has met this "narrow exception." *Windham*, 375 F.3d at 239.

C

Salamah advances three opposition positions that the court now addresses.

At oral argument, Salamah's counsel contended that Salamah was required to send her letter to the Student Promotions Committee because she was "before that committee, so that was the appropriate body to address[.]" Hr'g. Tr. at 17-18.[11] No evidence supporting this

[11]Citations to "Hr'g. Tr." are to an unofficial version of the transcript of oral argument of defendants' motion for summary judgment.

contention is in the summary judgment record. Accordingly, this argument lacks merit.

Salamah's counsel also asserted at oral argument that Dr. Wiles's failure to complete his form relieved Salamah of her responsibilities or that it was UT Southwestern's fault that the AAAC did not receive the proper documents. Hr'g. Tr. at 8-9. The court disagrees. Although Salamah asked Dr. Wiles for help with one of the three required forms, the overall responsibility lay with her. And a reasonable jury could only find that Dr. Sachs never received the forms, which was required to continue the interactive process. *See supra* § IV(A). In fact, Salamah acknowledged that the forms were her "responsibility." Ds. App. (ECF No. 69-1) at 107. Moreover, the precise parameters of Dr. Wiles's dual roles as Salamah's medical provider *and* as a UT Southwestern faculty member are not clear enough to enable a reasonable jury to impute his failures, if any, to UT Southwestern. Accordingly, Salamah's argument lacks force.

Finally, Salamah maintains that "Dr. Mihalic, Dr. Sachs, and Dr. Wiles were each aware of Salamah's serious medical condition, including hospitalization, and request for additional time to take the Step examination." P. Resp. (ECF No. 71) at 19. But Salamah's citations to the summary judgment record do not support this contention. *See* P. Resp. (ECF No. 71-1) at 51 (Dr. Mihalic merely stating that she was aware of some communications but not of their contents); *id.* at 115 (Salamah asking Dr. Wiles for help with her forms); *id.* at 145 (Dr. Sachs describing that she could not recall a request for medical leave). Moreover, whether Dr. Mihalic and Dr. Wiles knew of her medical conditions is not the proper focus

of the analysis, as shown above. *See supra* § IV(B)(2).[12]

D

The court holds that, because Salamah did not engage in the interactive process following the December 30, 2022 phone call, and because a reasonable jury could not find that UT Southwestern had knowledge of Salamah's disability, defendants are entitled to summary judgment dismissing her claims under the Rehabilitation Act and the ADA.

V

The court now considers, as an alternative ground for granting summary judgment, whether a reasonable jury could find that Salamah requested a "reasonable accommodation." *See Feist*, 730 F.3d at 452; *Jenkins v. Cleco Power, L.L.C.*, 487 F.3d 309, 315 (5th Cir. 2007).[13]

A

"The ADA and Rehabilitation Act do 'not mandate that an educational institution lower or [] effect substantial modifications of standards to accommodate a handicapped person, assuming such standards are reasonable.'" *Reiss v. Tex. A&M Univ*, 2023 WL 5105252, at *9 (S.D. Tex. Aug. 9, 2023), *report and recommendation adopted*, 2023 WL 5488431 (S.D. Tex. Aug. 24, 2023) (alteration in original) (quoting *McGregor v. La. State*

---

[12]Whether Dr. Sachs knew is, of course, relevant. But the summary judgment record is clear that she did not know of Salamah's disability in the sense that federal law requires.

[13]This section assumes *arguendo* that UT Southwestern had knowledge of Salamah's accommodations request.

*Univ. Bd. of Supervisors*, 3 F.3d 850, 855 (5th Cir. 1993)). Therefore, "[i]t is the plaintiff's burden to request reasonable accommodations." *Jenkins*, 487 F.3d at 315. Reasonable accommodations are those that "do not sacrifice the integrity of the program." *Reiss*, 2023 WL 5105252, at *9. And, "[a]bsent evidence of discriminatory intent or disparate impact, reasonable deference must be accorded to an educational institution's academic decisions" to deny or grant an accommodation. *Ward v. Franciscan Missionaries of Our Lady Univ.*, 2024 WL 4256334, at *18 (M.D. La. Sept. 20, 2024) (citing *McGregor*, 3 F.3d at 859).

Although the Fifth Circuit has described the foregoing inquiry as "rather mushy[,]" courts grant summary judgment on this issue when the defendant's "objections [to the accommodation request] legitimately relate to the impact the requested accommodation would have on the program," rather than acting as a disguise for "truly discriminatory requirements." *Brennan v. Stewart*, 834 F.2d 1248, 1261-62 (5th Cir. 1988); *Campbell v. Lamar Instit. of Tech.*, 842 F.3d 375, 381-82 (5th Cir. 2016) (quoting *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999)); *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 436 (6th Cir. 1998) (deferring to "professional judgment" that student needed to pass a full-length course); *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 88 (2d Cir. 2004) (deferring to school's determination that students need to pass Step 1 examination). This standard is met with facts showing "a professional, academic judgment that [the] accommodation is not available." *Zukle*, 166 F.3d at 1048 (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 27 (1st Cir. 1991)); *but see Forbes v. St. Thomas Univ., Inc.*, 768 F.Supp.2d 1222, 1233 (S.D. Fla. 2010) (holding that mere attorney explanations for a

policy are insufficient at the summary judgment stage).

In sum, the court is responsible for determining "'meta-reasonableness'; that is to validate reasonable restrictions; *and* to give 'reasonable deference' to the grantee's *own* determination of . . . reasonableness." *Brennan*, 834 F.2d at 1261 (emphasis in original). Although courts often resolve this deferential determination in favor of defendants, *see, e.g.*, *Shurb v. Univ. Tex. Health Sci. Ctr. at Hous.-Sch. of Med.*, 63 F.Supp.3d 700, 710 (S.D. Tex. 2014), "extending deference to educational institutions must not impede [the court's] obligation to enforce the ADA and the Rehabilitation Act." *Zukle*, 166 F.3d at 1048. Accordingly, in the instant case the court must determine the boundary between UT Southwestern's "right to decide . . . basic requirements . . . and [Salamah's] right to participate." *McGregor*, 3 F.3d at 858.

B

The court holds that Salamah's requested accommodations would cause substantial modifications to UT Southwestern's program and would not be reasonable.

1

The court initially addresses whether it owes deference to UT Southwestern's own determination of reasonableness.

Salamah maintains that the one-year Step 1 passage requirement is not academic and that UT Southwestern exhibited discriminatory intent.[14] According to Salamah, UT

[14]As mentioned above, Salamah has waived her disparate treatment theory.

Southwestern's decision "should not be considered academic because Salamah was not asking for a change in the curriculum[.]" P. Resp. (ECF No. 71) at 22-23. She provides no supporting authority for this assertion, and it is not apparent how testing deadlines would not be academic in nature. *See Academic*, *Black's Law Dictionary* (11th ed. 2019) ("Of, relating to, or involving a school or a field of study"). Therefore, the court holds that it is considering an academic decision.

As for Salamah's contention that UT Southwestern engaged in "[i]ntentional discrimination[,]" the court disagrees. P. Resp. (ECF No. 71) at 26-27.[15] Salamah has failed to produce sufficient evidence for a reasonable jury to find that UT Southwestern's decision was "clearly unreasonable[,]" i.e., deliberately indifferent to a known violation of federal rights. *Mendoza v. Amarillo Indep. Sch. Dist.*, 2026 WL 1834784, at *5 (N.D. Tex. June 25, 2026) (Kacsmaryk, J.); *see* Ds. App. (ECF No.69-1) at 20 (stating that Salamah did not believe that UT Southwestern harbored animus towards her because of her disabilities). The court therefore holds that a reasonable jury could not find that UT Southwestern engaged in intentional discrimination.

Because the court holds that a reasonable jury could not find discriminatory intent and that UT Southwestern's decision was academic in nature, it will "show great respect for the faculty's professional judgment." *Kaltenberger*, 162 F.3d at 436 (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).

---

[15]Although Salamah advances this position in the compensatory damages context, the court considers it contested here as well.

2

In support of their motion, defendants rely on the declaration of Dr. Mihalic, who served as UT Southwestern's Dean of Medical Students and Associate Dean for Student Affairs. Dr. Mihalic's declaration states that "[d]elaying Step 1" creates "gap[s] in time between the didactic, pre-clerkship phase and the patient rotations in the clerkship phase." Ds. App. (ECF No. 69-1) at 7. UT Southwestern seeks to reduce this temporal gap because information learned in the pre-clerkship phase is applied throughout the clerkship phase. And delays like Salamah's would reduce the extent to which "students can draw on their pre-clerkship education" in order to function in patient-facing clerkships. *Id.* Thus UTSW imposed its maximum mandatory one-year deadline as a matter of "patient care [and] patient safety." *Id.* at 38.

Furthermore, Dr. Mihalic avers that the one-year deadline ensures that "students are steadily progressing through their studies," without major gaps in their education.[16] *Id.* at 7. And, finally, UT Southwestern's experience has shown that "students who take longer to sit for Step 1 are less likely to pass the examination and graduate from medical school." *Id.* In essence, Dr. Mihalic is asserting that the "one-year timeframe for passing Step 1 is an essential component of UTSW's curriculum." *Id.* It so essential, in fact, that in Dr. Mihalic's "nearly two decades' worth of experience . . . UTSW has made no true exceptions

---

[16]UT Southwestern's concern for continuity is buttressed by its general policy that medical and personal leave must not exceed one year. *Id.* at 7-8.

to its one-year Step 1 deadline." *Id.* at 8.[17]

This summary judgment evidence reflects a "professional, academic judgment that [an extension to the 1-year policy] is not available." *Zukle*, 166 F.3d at 1048. UT Southwestern's concerns for patient safety, the continuity of medical education, and the ability of students to pass are all legitimately related to the "impact the requested accommodation would have on [its] program," and are not a mere disguise for discriminatory requirements. *Campbell*, 842 F.3d at 381. "In such a case," the "court must defer to the university's academic decision not to alter its program." *Id.* at 380.

Furthermore, UT Southwestern granted nearly all of Salamah's prior accommodation requests. *See supra* § I(A).[18] A reasonable jury could only find from this unrefuted evidence

---

[17]The only time that UT Southwestern modified the one-year Step 1 requirement was during the Covid-19 pandemic, "when testing sites were closed for three months." Ds. App. (ECF No. 69-1) at 8. Salamah cites this to support her case, although she relies on it to maintain that the one-year requirement was "non-essential." P. Resp. (ECF No. 71) at 30. Regardless, the court will address whether the Covid-19 modification had a bearing on the reasonableness of Salamah's requested accommodation, and concludes that it did not.

The Fifth Circuit, albeit in a different context, has decided not to use policies in place during the Covid-19 pandemic to evaluate current policies. *Hayes v. GStek, Inc.*, 175 F.4th 603, 607 (5th Cir. 2026). And in the absence of contrary authority, this court will do the same. The unique circumstances of the Covid-19 pandemic should not be used to modify policies that otherwise stood without fail for 20 years.

[18]In total, UT Southwestern gave Salamah an entire year to take and pass Step 1, which was coupled with a lengthy medical leave of absence where she had no other academic responsibilities. The only requirement that UT Southwestern asked of Salamah during this time was that she take Step 1 by November 16, 2022 and have a passing score before she returned—up until the one-year maximum. And this November date was merely the latest date by which Salamah had to first attempt Step 1; she was free to take it any point beforehand. Moreover, after learning of her failure, Salamah did not take a second test in the ten weeks before her leave expired because she "was burned out by . . .the prospect of [a]

that UT Southwestern was willing to accommodate Salamah to the extent that her requests would not "sacrifice the integrity of [its] program." *Reiss*, 2023 WL 5105252, at *9. And it makes the present case analogous to numerous cases where defendants did similarly. *Shurb*, 63 F.Supp.3d at 710 (granting summary judgment); *Reiss*, 2023 WL 5105252, at *9 (granting summary judgment); *Ward*, 2024 WL 4256334, at *18 (granting summary judgment).

Accordingly, because the court defers to UT Southwestern's "*own* determination of . . . reasonableness," and because the policy itself is reasonable, the court holds that Salamah's requested accommodation would sacrifice the integrity of UT Southwestern's program. *Brennan*, 834 F.2d at 1261 (emphasis in original).

3

Salamah opposition arguments are insufficient to withstand summary judgment. Salamah primarily maintains that this case is different because she is asking for "additional time to complete the same standards[,]" rather than for different standards of testing. P. Resp. (ECF No. 71) at 25. But even if the court agreed that temporal requirements are not "standards" in the sense that Salamah contends, this would have no effect. UT Southwestern

---

contracted deadline" and "consider[ing] the cost-benefit of continuing with medical school[.]" Ds. App. (ECF No. 69-1) at 103. In fact, Salamah "did not respond to communications from the Registrars' Office on requirements before returning from leave." P. App. (ECF No. 71-1) at 25.

Although the court sympathizes with Salamah's medical challenges, the summary judgment record demonstrates that UT Southwestern's one-year Step-1 passage requirement still afforded ample opportunity for its students to take and pass Step 1. A reasonable jury could not find that UT Southwestern's existing policy was unreasonable.

is entitled to impose reasonable temporal requirements on students, provided the requirements do not violate the ADA or the Rehabilitation Act. *See Cooney v. Barry Sch. of Law*, 720 Fed. Appx. 571, 574 (11th Cir. 2018) (holding that no jury could find that a "request for additional time" to submit program requirements was a "reasonable request for accommodation that would not cause a substantial alteration[.]"); *Aughe v. Shalala*, 885 F. Supp. 1428, 1430 (W.D. Wash. 1995) (upholding requirement that plaintiff "finish his secondary school program by age nineteen[,]" and disagreeing that "waiving completion before nineteen" would be a "reasonable modification."); *Klene v. Trs. of Ind. Univ.*, 2010 WL 2985176, at *7 (S.D. Ind. July 23, 2010) (granting summary judgment when plaintiff "was unable to timely complete the minimum requirements of the [] program"). Salamah failed to meet temporal requirements here, which were the same ones imposed on her classmates.

And although some of the cases that defendants cite focus on a plaintiff's mental capabilities, i.e., whether the plaintiff could pass exams *at all*, the deferential principles still apply to the temporal requirements at issue here. *Kaltenberger*, 162 F.3d at 436 ("Courts must also give deference to professional academic judgments"); *Powell*, 364 F.3d at 88 ("[w]hen reviewing the substance of a genuinely academic decision, courts should accord the faculty's professional judgment great deference."); *McGregor*, 3 F.3d at 859 ("we must accord reasonable deference to . . . academic decisions"); *Cunningham v. Univ. of N. M. Bd. of Regents*, 531 Fed. Appx. 909, 911 (10th Cir. 2013) ("[e]ducational institutions are accorded deference"). Accordingly, just as courts have accorded deference to *what*

universities require of their students to pass, this court accords deference to *when* UT Southwestern requires its students to pass.

Similarly, Salamah maintains that UT Southwestern's justifications are inappropriate given her previous academic success.[19] But Salamah cites no authority for the proposition that UT Southwestern may not consider the implications of allowing an accommodations request in general.[20] Granting Salamah's request could subject a once-firm, reasonable deadline to a deluge of inappropriate requests. And whether the application of UT Southwestern's policy to Salamah might be incongruous in certain respects is not controlling given that "the appropriate question is whether [UT Southwestern's] decision is '*rationally* justifiable' rather than the only possible conclusion[.]" *Guckenberger v. Boston Univ.*, 8 F.Supp.2d 82, 89 (D. Mass. 1998) (emphasis added) (quoting *Wynne*, 932 F.2d at 26). Accordingly, Salamah's contention that UT Southwestern must show that she was likely to fail Step 1 so as to justify its decision is not supported by the case law.

---

[19]Similarly, Salamah points to perceived inconsistencies between UT Southwestern's policies and its justifications. A reasonable jury could not find in her favor based on these perceived inconsistencies.

[20]Regardless, Salamah failed the exam nearly 11 months after finishing the pre-clerkship phase, something she noted as "truly a surprise[.]" Ds. App. (ECF No. 69-1) at 103. This supports UT Southwestern's position that, in general, students struggle with the Step 1 exam *and* with general medical knowledge the longer they are removed from the pre-clerkship phase.

C

The court therefore grants defendants' motion for summary judgment on the alternative ground that a reasonable jury could not find that Salamah requested a "reasonable accommodation."

* * *

For the reasons explained, the court grants defendants' motion for summary judgment and dismisses this action with prejudice.

**SO ORDERED**.

October 30, 2026.

SIDNEY A. FITZWATER
SENIOR JUDGE